FILED
2017 Mar-27 AM 08:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| AMELLIA PETERSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case Number: 4:16-cv-00080-JHE |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION[1]

Plaintiff Amellia Peterson ("Peterson") seeks review, pursuant to 42 U.S.C. § 405(g), § 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying her application for a period of disability and disability insurance benefits ("DIB"). (Doc. 1). Peterson timely pursued and exhausted her administrative remedies. This case is therefore ripe for review under 42 U.S.C. §§ 405(g), 1383(c)(3). The undersigned has carefully considered the record and, for the reasons stated below, the Commissioner's decision is **AFFIRMED**.

### I. Factual and Procedural History

Peterson filed her application for a period of disability and DIB on November 22, 2010, alleging she became unable to work beginning November 12, 2010. (Tr. 32, 168). The Agency initially denied Peterson's application, and Peterson requested a hearing where she appeared on June 15, 2012. (Tr. 96, 50-93). After the hearing, the Administrative Law Judge ("ALJ") denied

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 7).

Peterson's claim on September 25, 2012. (Tr. 29-44). Peterson sought review by the Appeals Council, but it declined her request on June 23, 2014. (Tr. 17-22). On that date, the ALJ's decision became the final decision of the Commissioner. After requesting and receiving more time to file a civil action, (tr. 1-4), on January 18, 2016, Peterson initiated this action. (*See* doc. 1).

Peterson was a forty-year-old when the ALJ issued his decision. She held an associate's degree in computer technology, a bachelor's degree in software engineering, and a master's degree in liberal arts. (Tr. 44, 55, 58, 172). Peterson is also a licensed practical nurse ("LPN"). (Tr. 59). She had previously worked as a poultry de-boner, licensed practical nurse, office nurse, tire builder, teacher, and software specialist. (Tr. 82-83, 183). Peterson alleges her disability began on November 12, 2010, due to dilated nonischemic cardiomyopathy and severe mitral insufficiency with ejection fraction of ten percent. (Tr. 172).

## II. Standard of Review[2]

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this Court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This Court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

---

[2]In general, the legal standards applied are the same whether a claimant seeks DIB or Supplemental Security Income ("SSI"). However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

This Court must uphold factual findings supported by substantial evidence. "Substantial evidence may even exist contrary to the findings of the ALJ, and [the reviewing court] may have taken a different view of it as a factfinder. Yet, if there is substantially supportive evidence, the findings cannot be overturned." *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). However, the Court reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[3] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is

---

[3]The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499.

disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The Commissioner must determine in sequence:

 (1) whether the claimant is currently employed;
 (2) whether the claimant has a severe impairment;
 (3) whether the claimant's impairment meets or equals an impairment listed by the [Commissioner];
 (4) whether the claimant can perform his or her past work; and
 (5) whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to the formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job." *Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner must further show such work exists in the national economy in significant numbers. *Id.*

## IV. Findings of the Administrative Law Judge

After consideration of the entire record and application of the sequential evaluation process, the ALJ made the following findings:

At Step One, the ALJ found Peterson meets the insured status requirements of the Social Security Act through December 31, 2014 (her date last insured or "DLI"), and that Peterson had not engaged in substantial gainful activity from her alleged onset date of November 12, 2010. (Tr. 34). At Step Two, the ALJ found Peterson has the following severe impairments: history of nonischemic cardiomyopathy with congestive heart failure; valvular heart disease (mitral and tricuspid valves); hypertension; status post implantable cardioverter defibrillator (ICD) implantation; status post lumbar surgery with L4-S1 fusion; and obesity. (*Id.*). At Step Three, the

ALJ found Peterson did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 35).

Before proceeding to Step Four, the ALJ determined Peterson's residual functioning capacity ("RFC"), which is the most a claimant can do despite her impairments. *See* 20 C.F.R. § 404.1545(a)(1). The ALJ determined that Peterson had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except that she is precluded from standing or walking for more than 15 minutes at one time; she is limited to occasional climbing, balancing, kneeling, crouching, and crawling; she is precluded from exposure to extremes of temperature or pulmonary irritants; and she is precluded from work around unprotected heights. (Tr. 37-42).

At Step Four, the ALJ determined, Peterson is capable of performing past relevant work as a software specialist. (Tr. 42). Alternatively, the ALJ considered the Step Five analysis of whether there are other jobs in the national economy that Peterson could perform based on her RFC assessment. (Tr. 43). Relying on testimony from a vocational expert ("VE"), the ALJ found that an individual with Peterson's limitations could perform other jobs existing in significant numbers in the national economy. (Tr. 42-43, 89-91). The ALJ found Peterson was not disabled. (Tr. 44).

## V. Analysis

Although the court may only reverse a finding of the Commissioner if it is not supported by substantial evidence or because improper legal standards were applied, "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)). The court, however, "abstains from reweighing the evidence or substituting its own judgment for that of the

[Commissioner]." *Id.* (citation omitted).

Here, substantial evidence supports the ALJ's determination Peterson failed to demonstrate a disability, and the ALJ applied the proper standards to reach this conclusion. Peterson challenges the Commissioner's decision on two specific grounds, contending: (A) the ALJ erred when he improperly considered the cardiologist's opinion that Peterson has NYHA Class II symptoms in determining her RFC to perform certain sedentary jobs, (doc. 11 at 13-15), and (B) the ALJ erred when he accorded treating physician Dr. Morgan-Graves' opinion little or no weight, (*id*. at 15-17).

### A. The ALJ Properly Assessed Peterson's RFC, Including the opinion she exhibited NYHA Class II Symptoms

A claimant's RFC is the most she can do despite her limitations and is based on an evaluation of all the relevant evidence in the record. *See* 20 C.F.R. §§404.1520(e), 404.1545 (a)(1), (a)(3); Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *2 (1996). At the hearing level, it is the ALJ's responsibility to assess the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 1996 WL 374183, *2, 5 (1996); *see also* 20 C.F.R. §404.1527(d)(2).

Here, the ALJ determined Peterson retained the RFC for a range of sedentary work after considering the entire record. (Tr. 37). The ALJ considered all the relevant evidence and thoroughly discussed the medical records from Peterson's cardiologists and specifically considered diagnostic findings, opinion evidence, subjective allegations, activities of daily living, and work activity. (Tr. 37-42).

Substantial evidence supports the ALJ's RFC assessment. As the ALJ noted, the medical evidence indicates Peterson was hospitalized in December 2006, and diagnosed with decompensated congestive heart failure, dilated cardiomyopathy, probable viral cardiomyopathy, and a history of hypertension. (Tr. 39). However, as the ALJ discussed, Peterson experienced

significant improvement with treatment and subsequently held jobs involving light to heavy exertion, with earnings of $22,000 to $30,000, from 2006 to 2010. (Tr. 39, 82-84, 159, 183).

After Peterson stopped taking some or all of her medications in 2010, she experienced increased symptoms in August 2010, and was referred for consideration of a cardiac transplant. (Tr. 39, 244, 246). As the ALJ noted, the medical evidence shows improvement with treatment. (Tr. 39-40, 342-44). On January 6, 2011, Peterson reported fatigue with activities but stated she was able to perform her activities of daily living, complete one flight of stairs without stopping, and walk the entire store when shopping at Wal-Mart. (Tr. 344). She also stated she was able to work a twelve-hour shift as a nurse, although she explained she did not have to do any lifting as part of her responsibilities and that she had significant fatigue by the end of her shift. (Tr. 344). On January 25, 2011, Peterson denied having orthopnea, lower extremity edema, palpitations, dizziness, or syncope. (Tr. 342). At that time, Salpy Pamboukian, M.D., concluded Peterson was "too well" for transplantation and discussed the possibility of an Implantable Cardioverter Defibrillator ("ICD"), a battery-powered device placed under the skin that keeps track of a person's heart rate and administer an electric shock to restore a normal heart beat if an abnormal heart rhythm is detected. (Tr. 342-43). Dr. Pamboukian assessed Peterson's congestive heart failure as Class II to early Class III on the New York Heart Association Functional Classification scale ("NYHA"), with fatigue as her predominant symptom. (Tr. 40, 367-68). At the time, Peterson reported she could walk up to two miles at times, but generally she could walk less than one mile per day without shortness of breath. (Tr. 367). Dr. Long and Dr. Smallfield noted that a March 2011 exercise stress test showed fair tolerance, and they classified Peterson's symptoms as NYHA Class II. (Tr. 368). They referred Peterson for an ICD, which was implanted by Vance Plumb, M.D., on July 1, 2011. (Tr. 40, 368, 377). On July 28, 2011, Dr. Plumb noted that Peterson had

7

done "relatively well" since the ICD was implanted and classified her symptoms as NYHA II. (Tr. 40, 437). He documented that Peterson denied a history of syncope, dizziness, lightheadedness, or orthopnea. (Tr. 437). During a follow-up visit with Dr. Plumb on February 2, 2012, Peterson reported she was "good," and Dr. Plumb documented that she had no ICD discharges and no signs or symptoms of decompensated heart failure. (Tr. 40, 374). Upon examination, Dr. Plumb's observations were generally unremarkable. (Tr. 374). Dr. Plumb stated Peterson seemed "satisfactory" and that "no changes [were] indicated in her medications." (Tr. 374).

The evidence in the record supports the ALJ's finding that Peterson could perform a range of sedentary work. (Tr. 37). While the medical records show exacerbated symptoms during periods in 2006 and 2010, the records also show Peterson's condition improved with treatment such that her symptoms were classified as NYHA Class II, (tr. 368, 437), which indicates mild symptoms with "slight limitation of physical activity." The ALJ's RFC finding accounts for such symptoms. (Tr. 41). Further, Peterson's ability to work twelve-hour shifts as a nurse in 2011, and walk up to two miles at times supports the ALJ's finding that she could perform sedentary work with no standing or walking for more than fifteen minutes at one time. (Tr. 37, 344, 367).

The opinion from the state agency's reviewing cardiologist, James O. Finney, Jr., M.D., also supports the ALJ's RFC assessment. (Tr. 357). On March 28, 2011, Dr. Finney reviewed the record and opined that Peterson had the capacity for light work. (Tr. 357). Although the ALJ found Peterson more limited, Dr. Finney's opinion supports the ALJ's determination that Peterson was no more limited than described in the RFC. (Tr. 42).

To the extent Peterson argues the ALJ based his RFC solely on the classification of her symptoms as NYHA Class II, such an argument misconstrues the ALJ's decision. (Doc. 11 at 13-14). Contrary to Peterson's assertion, the ALJ considered all of the relevant evidence in assessing

her RFC and properly discussed her NYHA classification as one part of the record. (Tr. 41). *See e.g., Benford v. Colvin*, No. 6:13-cv-00397-MHH, 2015 WL 1492386, *7 (N.D. Ala. Mar. 31, 2015) (observing the claimant's heart condition was most recently classified as Class II, which "represents that she may have a 'slight limitation' during ordinary physical activity").

The ALJ was not required to base his RFC finding on a physician's opinion. Assessing a claimant's RFC is an issue reserved for the Commissioner and specifically for the ALJ at the hearing level. *See* 20 C.F.R. §§ 404.1527(d)(2), 404.1546(c); SSR 96-8p, 1996 WL 374184, at *2. Thus, an ALJ is not required to base his RFC finding on a doctor's opinion. *See Castle v. Colvin*, 557 Fed. Appx. 849, 85-54 (11th Cir. 2014). Here, the ALJ properly performed his responsibility of evaluating the relevant evidence in assessing Peterson's RFC.

### B. The ALJ Properly Assessed the Opinion of Dr. Morgan-Graves

In a letter dated June 12, 2012, Peterson's primary care physician, Sabrina Morgan-Graves, M.D., opined that Peterson should not work. (Tr. 468). Dr. Morgan-Graves stated that Peterson's cardiomegaly and congestive heart failure caused severe shortness of breath, dyspnea on exertion, and severe swelling in her legs while working. (Tr. 468). Dr. Morgan-Graves recommended Peterson not work because working made her symptoms worse and because Peterson was at a high risk of sudden cardiac arrest or heart attack. (Tr. 468). She also recommended Peterson not work because of her medications, which were associated with side effects including weakness, dizziness, low blood pressure, and fainting. (Tr. 468). Peterson argues the ALJ erred when he accorded little to no weight to Dr. Morgan-Graves' opinion that Peterson should not work.

Contrary to Peterson's argument, the ALJ properly discounted Dr. Morgan-Graves' opinion. (Tr. 41). When determining the weight to give to a physician's opinion, an ALJ considers numerous factors, including whether the physician examined the claimant, whether the physician

treated the claimant, the evidence the physician presents to support his or her opinion, whether the physician's opinion is consistent with the record as a whole, and the physician's specialty. *See* 20 C.F.R. § 404.1527(c). A treating physician's opinion is generally entitled to more weight, and an ALJ must provide good reasons for discounting a treating physician's opinion. *See* 20 C.F.R. §404.1527(c)(2); *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). However, an ALJ may discount a treating physician's opinion when the opinion is conclusory, the physician fails to provide objective medical evidence to support his or her opinion, the opinion is inconsistent with the record as a whole, or the evidence otherwise supports a contradictory finding. *See* 20 C.F.R. § 404.1527(c); *Crawford*, 363 F.3d at 1159-60.

Here, the ALJ provided proper reasons supported by substantial evidence for discounting Dr. Morgan-Graves' opinion. (Tr. 41). First, the ALJ noted that Dr. Morgan-Graves is not a cardiologist. (*Id.*). *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). As Dr. Morgan-Graves' opinion exclusively concerns cardiac conditions, the ALJ properly considered her lack of specialization in cardiology. (Tr. 41, 468). Second, the ALJ noted Dr. Morgan-Graves' opinion was not consistent with the extensive treatment records from Peterson's cardiologists. (Tr. 41). Records from Peterson's treating cardiologists indicate far less severe symptoms than Dr. Morgan-Graves identified. For example, on January 25, 2011, Peterson denied any orthopnea, lower extremity edema, palpitations, dizziness, or syncope. (Tr. 342). On February 9, 2012, Dr. Plumb documented that Peterson reported she was "good" and that she had no signs or symptoms of decompensated heart failure. (Tr. 435). Upon examination, Dr. Plumb described Peterson as appearing in no distress, and he did not indicate any abnormality of her extremities. (Tr. 435). Moreover, records from Peterson's

10

treating cardiologists do not show that Peterson suffered from the side effects Dr. Morgan-Graves identified. (Tr. 342, 367, 374, 437). Notably, in her application, the only side effect Peterson reported from her medication was excess urination. (Tr. 241). Further, as the ALJ observed, Peterson denied having any side effects from her medication during her physical consultative examination with Jessica Williams-Vincent, M.D. (Tr. 41, 353).

Furthermore, Dr. Morgan-Graves opinion is not consistent with NYHA Class II symptoms. While the NYHA states that ordinary physical activity results in fatigue, palpitations, or dyspnea, it does not state that such activity results in *severe* manifestations of such symptoms as Dr. Morgan-Graves opined. (Tr. 468). Rather, NYHA describes Class II symptoms as "mild." Additionally, NYHA describes Class II symptoms as causing "slight limitation on physical activity" which is inconsistent with Dr. Morgan-Graves' opinion that Peterson's symptoms render her unable to perform any work. (Tr. 468). The ALJ properly assessed and discounted Dr. Morgan-Graves' opinion.

## VI. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, the decision of the Commissioner of Social Security denying Peterson's claim for a period of disability and disability insurance benefits is **AFFIRMED** and this action **DISMISSED WITH PREJUDICE.**

DONE this 27th day of March, 2017.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE